UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **VERLIE SCUDDER,** <br><br> Plaintiff, <br><br> v. <br><br> **COMMISSIONER OF SOCIAL SECURITY,** <br><br> Defendant. | Civ. No. 2:11-cv-06286 (KM) <br><br> **OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

      Verlie Scudder brings this action pursuant to 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Social Security Disability Insurance benefits ("SSDI"). Ms. Scudder asserts that the decision was not based on substantial evidence and that the Commissioner erred as a matter of law. For the reasons set forth below, the Commissioner's final decision is **AFFIRMED**.

**I.   BACKGROUND**

      Plaintiff, Verlie Scudder, filed an application for SSDI on April 29, 2008. Pl. Br. (Docket No. 10) at 3; Record of Proceedings ("R __") (Docket No. 9) at 11. Scudder's claim was denied initially on October 9, 2008, and again on reconsideration on November 19, 2008. R 11. Scudder and her attorney appeared before Administrative Law Judge ("ALJ") Joel H. Friedman on March 4, 2010, in Newark, New Jersey. *Id.* The ALJ denied Scudder's application in a decision dated February 23, 2011. R 8. Scudder appealed the decision to the Appeals Council on March 31, 2011. R 6. The Appeals Council denied her request for review on September 29, 2011, thus making the ALJ's decision the "final decision" of the Commissioner. *Id* at 1-3.

      **A. Plaintiff's Testimony and Non-Medical Evidence**

      Scudder filed an application for SSDI on April 29, 2009, claiming that she had been disabled since January 27, 2007. R 23, 146. She was 46 years

1

old at the alleged onset date. R 14, 25, 146. The basis for Scudder's claim was a combination of osteoporosis of the back, back problems, and a torn rotator cuff.[1] R 23, 25-26.

### 1. Testimony from Plaintiff

At her March 4, 2010 hearing, Scudder testified that she lived in an apartment in Paterson, New Jersey. R 27. She did not drive because she had lost her license as a result of failing to pay tickets. *Id.*[2] Scudder's apartment was on the second floor of her building, which did not have an elevator. R 28. She had difficulty using the stairs and would sometimes have to stop midway to rest. *Id.* She reported in a SSA Function Report that she prepared her own meals a few times a week, but that someone else had to prepare them when she was not able to do so. R 160. She also reported she did a "little" cleaning and ironing, but did not receive any assistance with those tasks. *Id.* At the hearing, however, she stated that she was not able to do any housework. R 37.

Scudder attended high school through the tenth grade. R 28, 144. She did not receive a GED. *Id.* She attended Passaic County Community college to obtain a Certified Nursing Assistant license and was certified in 1994.[3] R 28-29. At the time of her application, she received general assistance through welfare and Medicaid. R 30.

Scudder last worked on January 27, 2007. R 30. Her most recent job was as a full-time cashier at a Pathmark supermarket from 2001-2007. R 33, 140. Before that, she worked at a White Castle restaurant as a cashier/cook (2000-2001); as a factory packer (1998); as a cafeteria monitor (1995); and as a certified nurse's aide ("CNA") (1992-1994). R 33, 140. At both White Castle and Pathmark, Scudder was required to lift bags weighing about 20 pounds. R 33, 35, 141, 152. She stopped working after she hurt her back lifting a bag of charcoal at Pathmark. R 33.

---

[1] Scudder's attorney stated at the hearing before the ALJ that Scudder also had a thyroid disorder. That alleged impairment is not discussed in any detail in the record. R 25.

[2] On a June 4, 2008 Function Report, Scudder reported that she did not drive because her back got stiff when she was behind the wheel. That report did not indicate that she had lost her license. R 161.

[3] Scudder was not required to have a high school diploma or GED to take courses at the college.

Scudder testified that she could not work because her "left side" was "completely numb." R 29. She had been in physical therapy for two years and attested that her physical therapist told her that her left side was "dead." *Id.* She stated that she could not stand or sit for long because her back bothered her and she had to sit down. *Id.* She described her back pain as severe, and said that on some days she could not get out of bed because of the pain. *Id.* She testified that her doctors said the pain was from osteoporosis and lower lumbar sprain. *Id.* Her last physical therapy appointment was at St. Joseph's Hospital in June 2009 (about ten months before the hearing).

Scudder testified that she had no feeling in her left hand, and that her right hand did not operate at its "full capacity." R 37. After walking about a block, she testified, she would get a shooting pain in her spine and would have to stop for about twenty minutes. R 38. After standing or sitting for more than thirty minutes her back would also get stiff and she would need to stretch. R 39. She stated that she could probably lift about ten pounds. *Id.* She did not use a cane, crutches, walker, or other walking aid. R 164.

At the hearing, she stated that she took several medications: Ultrams (a brand name for tramadol, a pain medication) twice a day, and Ibuprofen every six hours. R 30. She also stated that she took Percocet when the other medication was not working, about every other day. In addition, she said she took Norvasc for blood pressure and Zantac for gallstones and ulcers, as well as a multivitamin. *Id.* R 31. In her disability report, Scudder stated that she was taking two prescription medications: Fosamax D for osteoporosis and Tramadol for pain. R 143.

Scudder stated that on a typical day, she would "sit around and watch TV" because she needed assistance from her daughter to get dressed, do her hair, and cook. R 36. In addition to watching TV, she liked to do puzzle books and latch hook (a knitting-like activity). R 36, 161. She stated that she could only do latch hook for about a half-hour at a time because her back would get stiff and her fingers would cramp up. *Id.* In the past, she enjoyed biking and walking, but testified that she was no longer able to do those activities. R 38.

### 2. Testimony from Vocational Rehabilitation Counselor

The ALJ heard expert testimony from Pat Green, a vocational rehabilitation counselor. R 43. Scudder's counsel did not object to Green's testimony. R 44-45. *See also* Green Resume (Exh. 8B) R 116.

3

Green classified the work Scudder had performed over the last fifteen years. Her work as a fast food worker was classified as SVP 2, skilled at a light level. R 47. Her work as a cashier was classified as SVP 2, unskilled at a light level. Her work as a CNA was outside the scope of Green's review, but Green stated that it would have been classified as medium level. *Id.*

Green also testified about available jobs in the region—defined as New Jersey, New York, and Connecticut.[4] *Id.* Green testified that someone with Scudder's impairment—described by the ALJ as mild reduction in range of motion and sensation but normal grip and pinch in her non-dominant hand—could continue to do her past work. R 48-49.

The ALJ posed several hypothetical questions to Green. He asked whether the past relevant work could still be done if the claimant also had problems reaching overhead with her left arm and had some left shoulder problems so that she could only lift or reach overhead occasionally with that arm. Green responded that the claimant could still do the past relevant work with that impairment. R 50. Green also stated that someone with that impairment could perform sedentary jobs, such as an addresser, ticket checker, or sorter. *Id.* In the regional economy, Green stated, there were available approximately 1,600 jobs as an addresser, 5,500 as a ticket checker, and 1,600 as a sorter. R 50-51.

The ALJ then asked Green whether someone could still do those jobs if her pain or medication side effects caused difficulty maintaining concentration, persistence, and pace on a simple, routine job. R 51. Green stated that neither the past relevant work nor the sedentary jobs could be done with those impairments. *Id.* The claimant would also not be able to do her past relevant work if she could only sit or stand for thirty minutes at a time. She could, however, do sedentary work if she were permitted to get up and stretch. R 51-52. She could also do other light level jobs such as hand packager (3,000 jobs in region); ticket seller (4,000 jobs in region); or garment sorter (3,000 jobs in region). R 51-53. If the claimant had to frequently get up from her work station and walk away, however, she would be unable to perform such sedentary work. R 52. She also could not perform any of those jobs if she had to lie down or stop working after thirty minutes. R 54.

---

[4]  Green testified that she obtained her statistics from the Department of Labor. R 59.

4

In response to questions from Scudder's attorney, Green testified that if Scudder's impairment caused her to miss more than four days per month, she would not be able to do any of the jobs listed previously. R 55. She would not be able to do any of those jobs if she needed to break for twenty to thirty minutes every one to two hours, or if she could sit for only four hours in an eight hour day. R 55-56. The ALJ interjected to ask whether any of the jobs could be performed if the claimant could sit for four hours and stand for the other four hours. R 57. Green testified that she would be able to do "light" jobs under those circumstances. *Id.*

**B. Medical Evidence**

### 1. Records from St. Joseph's Regional Medical Center (Emergency and Outpatient)

On January 16, 2007, Scudder had a Dual-Energy X-Ray Absorptiometry ("DEXA") bone density test at St. Joseph's Regional Medical Center. R 222 (reviewed by Patrick Conte, M.D.). The test showed that Scudder had a total T-score of -3.6 for her lumbar spine, which is consistent with "marked osteoporosis and high risk of fracture." R 223. Her T-score for the left hip was -1.7, consistent with "moderate osteopenia and increased risk of fracture." *Id.*

Scudder returned to St. Joseph's for a CT of her lumbar spine on November 9, 2007. R 215, 238 (reviewed by Madelyn Danoff, M.D.). The CT showed that her vertebral body heights were intact. There were "mild broad-based" disc bulges at L4-5 and L5-S1. There was no evidence of disc herniation. *Id.* Scudder had two MRIs of her cervical spine. The first, on March 24, 2008, showed no gross evidence of acute fracture or dislocation. R 212 (reviewed by Pilar M. Prabhu, M.D.) Scudder's vertebral heights were grossly maintained. There were "mild" degenerative changes at C6-C7. *Id.* She then received another MRI of her back on May 2, 2008. R 230 (reviewed by Bhanu Aluri, M.D.). That MRI showed hemangioma within her T1 vertebral body; additional focus of abnormal signal intensity within the C6 vertebral body suggestive of an atypical hemangioma; mild anterior subluxation of C4 on C5; no focal disc herniation, central canal, later recess or neural foraminal stenosis; and abnormal signal intensity within both thyroid lobes needing further evaluation with a thyroid ultrasound. R 230.

On March 20, 2008, Scudder went to the emergency room of St. Joseph's for shoulder pain. R 183. She was seen by Dr. Nader Boulos, M.S., and diagnosed with tendinitis of the biceps in her rotator cuff. *Id.* Her exam

5

revealed no fracture, dislocation or subluxation. R 187. An MRI of Scudder's left shoulder showed no fracture, dislocation or subluxation. R 213, 236 (reviewed by Matthew P. Forte, M.D.). She was given a prescription of Percocet and instructed to take it every 4-6 hours as needed for pain. Scudder was instructed to follow up with her physician within three to four days. R 186. Scudder received a second shoulder MRI on April 8, 2008. R 235 (reviewed by Edward Milman, M.D.). That MRI showed tendinopathy of the supraspinatus with a "small bursal surface tear" measuring 2 mm in thickness and about 3 mm in depth. *Id.* There was no evidence of a full thickness tear and no muscle denervation. *Id.*

The record also contains a report for the period April 9, 2009, to May 4, 2009, of physical therapy for her lower back pain and right shoulder pain. R 282-287. That report indicated that Scudder's progress was "good." *Id.* Treatment interventions included modalities, manual therapy, ROM joint therapy, Progressive Resistive Exercises ("PRE's"), home exercise program, and posture/body mechanics. R 282. The report rated her functional status for a variety of daily tasks on a scale from zero (unable) to four (normal). Those tasks included dressing, bathing, grooming, overhead reaching, pushing and pulling, lifting, ambulation, stairs, and sleeping for more than six hours. For each of those identified tasks, Scudder's functional status was rated as three to four. *Id.* Scudder was discharged from treatment for non-compliance. *Id.*

Scudder visited the St. Joseph's emergency room again on February 1, 2010. She was seen by Marc Bornstein, D.O., and diagnosed with cervical radiculopathy and degenerative disc disease-DJD. R 262. She was prescribed Percocet for pain. *Id.* In addition, she was referred to an Orthopedics Clinic in Paterson, New Jersey, and instructed to follow up there within two to three days. R 268.

### 2. Records from Paterson Community Health Center

Scudder's primary care facility was Paterson Community Health Center ("PCHC"), where she went from 2007 to 2008 for various complaints, including back and shoulder pain. Her treating physician at PCHC was Karen Yung, M.D.

Scudder went to PCHC on February 14 and February 20, 2007, for management of back pain. R 208, 210. On February 27, 2007, she returned complaining of severe back pain. R 206. She complained that she had difficulty walking and sitting. *Id.* She went back to PCHC on March 6, 2007, for a prescription refill. R 204. On April 10, 2007, Scudder was seen for complaints

6

of headache. R 202. She was seen again on May 7, 2007 with complaints of back pain. R 200-201. On June 18, 2007, she returned for a prescription refill. R 198-99. On July 28, 2007, she was seen for her osteoporosis. R 196-97. She went back on October 31, 2007 for complaints of abdominal pain, back pain, and right hand swelling. R 194-95. She returned on January 4, 2008 with complaints of right leg discomfort and left arm and elbow discomfort. R 192. On March 12, 2008, Scudder went to PCHC for "further management" of back and shoulder pain. R 190-91. Scudder returned on April 1, 2008 regarding her left shoulder pain. R 188-89. She had a follow-up visit on August 8, 2008. R 275-76. [The doctor's notes regarding the reason for this visit are illegible.]

Dr. Yung completed a Physical RFC questionnaire on January 9, 2009. R 258-261. Dr. Yung stated that Scudder's diagnosis was primary [illegible] with [illegible], low back pain and osteoporosis. She indicated the prognosis would be worse with time. R 258. Dr. Yung identified her clinical findings as cervical spine mild degenerative changes at C6-7, lumbar spine mild broad-based disc bulges at L4-L5 and L5-S1, but no evidence of disc herniation, and left shoulder [illegible]. *Id.*[5]

Dr. Yung reported that Scudder's impairments were "reasonably consistent" with the symptoms and functional limitations in the evaluation. R 259. She reported that Scudder's pain and other symptoms would interfere frequently with the attention and concentration needed to perform simple work tasks. *Id.* She wrote that Scudder was incapable of tolerating even a "low stress" job.[6] *Id.* She found that Scudder could walk only half a block without rest or severe pain. She indicated that Scudder could only sit for 30 minutes and stand for 30 minutes without needing to get up or sit down and walk around. *Id.* She found that, in an eight hour work day, Scudder could sit for about four hours and stand or walk for about four hours. R 260. During the day, Scudder would need to walk around for approximately twenty minutes every sixty minutes. *Id.* She would need a job that permitted shifting positions at will from sitting, standing, or walking, and she would sometimes need to take unscheduled breaks every one to two hours for twenty to thirty minutes. *Id.*

---

[5]   Nothing else in the record assists with decipherment of the illegible portions of Dr. Yung's notes.

[6]   No explanation for this conclusion was given, although the form requests one. R 259.

Dr. Yung reported that Scudder could "occasionally" lift ten pounds and rarely lift twenty or fifty pounds.[7] *Id.* She could "occasionally" turn her head to the right or left, or look up. She could "rarely" hold her head in a static position. R 260. She could "rarely" twist, stoop, crouch, climb ladders, or climb stairs. R 261. She had significant limitations reaching because her hands got numb. *Id.* In an eight hour work day, she could use neither her right[8] nor left hand for more than thirty percent of the time to grasp, turn, or twist objects or reach overhead. She could use neither hand more than fifty percent of the time for fine manipulations. *Id.* She would likely be absent more than four days a month as a result of her impairments or treatment. *Id.*

Dr. Yung completed a second assessment on February 12, 2010. R 273-74. That assessment stated that Scudder could lift less than ten pounds with "very little" frequency. R 273. It also said that she could stand for only one hour during an eight hour day and sit for a total of five hours (but only for 30 minutes without interruption). *Id.* Nothing was filled in the part of the report asking for medical findings supporting these calculations. *Id.* Dr. Yung also found that Scudder could "frequently" climb and balance, "occasionally" stoop and crouch, and "never" kneel or crawl. R 274 (citing Scudder's back pain as the reason for those limitations). Dr. Yung further found that Scudder had limitations on reaching, handling, feeling, and pushing/pulling. *Id.* (citing Scudder's left arm pain and left hand problems and numbness). Yung also found Scudder would be restricted from working with moving machinery and vibration because of her left side pain. *Id.*

### 3. Orthopedic Consultative Examination Report from Mariam Rubbani, M.D.

Mariam Rubbani, M.D., submitted a report from a September 12, 2008 consultative exam of Scudder. R 239. Dr. Rubbani reported that Scudder had a history of osteoporosis in her back and pain in the lower left side of her back. Scudder reported that she had had a hysterectomy. *Id.* She had not been hospitalized for any reason. She had arthritis and stated that she had a

---

[7]    The report indicates that Dr. Yung first selected "occasionally" for twenty and fifty pounds, and then crossed it out. R 260.

[8]    There is no other evidence in the record, including Scudder's own statements and reported symptoms, indicating that Scudder had any problem with her right hand. This section of the form required Dr. Yung to select the appropriate percentage for each hand. *See* R 261.

8

respiratory problem in 2004. *Id.* She denied having high blood pressure, diabetes, angina, heart attack, or heart disease. *Id.* She listed multiple medications but only brought Roxicet and Tramadol with her. She smoked seven cigarettes a day but denied alcohol use. *Id.* Dr. Rubbani reviewed reports of the lumbar CT scan showing mild broad-based disk bulges at L4-L5 and L5-S1 without disk herniation and mild degenerative changes at C6 and C7. Dr. Rubbani wrote that Scudder lived with her children, did not use an assistive device, and was independent in activities of daily living. *Id.*

As to her physical exam, Dr. Rubbani wrote that Scudder was able to transfer to and from the exam table without difficulty. *Id.* Scudder complained of left shoulder pain greater than right shoulder pain, and had left biceps tendon insertion tenderness to palpation. *Id.* Otherwise, her shoulder ranging was full. Wrist ranging was full except on the left side where it was limited to 40 degrees. *Id.* She could not fully extend her left hand, and she said that she had been diagnosed with carpal tunnel syndrome in the left hand. She was wearing a splint before coming to the appointment. *Id.* She was able to don and doff the splint on her own. She had full grip and pinch strength in both hands. *Id.* Her hip ranging was limited bilaterally because of associated neck and shoulder pain. Her lumbar spine ranging was slightly limited. *Id.* She was able to squat halfway down. She did not walk on her heels or toes because of pain in her right leg. *Id.* She reported that her entire left hand in a stocking glove distribution had decreased sensation. There was no reflex loss or muscle weakness at all. She walked at a reasonable pace and her gait was tandem, heel to toe, antalgic (against the pain) to the right. R 239-240.

### 4. Physical RFC Assessment from Raymond Briski, M.D., and Joseph Udomsaph, M.D.

In his October 8, 2008 RFC assessment, Dr. Briski reported Scudder's primary diagnosis as lumbar/cervical degenerative joint and disc disease with left shoulder tendinopathy. He reported that Scudder's exertional limitations were such that she could (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk for a total of about six hours in an eight hour day; (4) sit for about six hours in an eight hour day; and (5) push and/or pull an unlimited amount (other than as shown for lift/carry). R 244. For this assessment, he relied on the report submitted by Dr. Rubbani. *See id.*

Briski's assessment also reported that Scudder had the following postural limitations: she could (1) occasionally climb ramp/stairs and

9

ladder/rope/scaffolds; (2) frequently balance; (3) occasionally stoop; (4) frequently kneel; (5) occasionally crouch; and (6) frequently crawl. R 245. The assessment also reported she had the following manipulative limitations: limited feeling (skin receptors). R 246. She had no limitations as to reaching in all directions, handling (gross manipulation), or fingering (fine manipulation). *Id.* Dr. Briski explained that Scudder had reduced left hand sensation of undetermined etiology, but she had normal pinch and grip strength (and therefore no manipulative limitations). *Id.* She had no visual, communicative, or environmental limitations. R 246-47.

Dr. Briski noted that there was no treating source's statements regarding Scudder's physical capacities. R 249. (His assessment pre-dated the RFC report from Dr. Yung.)

Briski's assessment was re-reviewed on November 19, 2008, by Joseph Udomsaph, M.D. At that time, Scudder had not reported any new injuries or illnesses, and had not provided any new treating sources. The original assessment was affirmed. R 257.

## II. DISCUSSION

### A. Legal Framework

#### 1. The Five-Step Sequential Analysis

Under the authority of the Social Security Act, the Social Security Administration ("SSA") has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

*Step 1*: Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, move to step two.

*Step 2:* Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.

*Step 3*: Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A. If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

*Step 4*: Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)-(f), 416.920(e)-(f). If not, move to step five. Up to this point (steps 1 through 4) the claimant has borne the burden of proof.

*Step 5*: The burden shifts to the SSA to demonstrate that the claimant, considering his or her age, education, work experience, and RFC, is capable of performing other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, DIB will be denied; if not, they will be awarded.

### 2. Standard of Review

As to legal issues, this Court's review is plenary. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to the factual findings of the Administrative Law Judge ("ALJ"), however, this Court is directed "only to determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *accord Richardson v. Perales*, 402 U.S. 389, 401 (1971).

> [I]n evaluating whether substantial evidence supports the ALJ's findings . . . leniency should be shown in establishing the claimant's disability, and . . . the Secretary's responsibility to rebut it should be strictly construed. Due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails.

11

*Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal citations and quotations omitted). When there is substantial evidence to support the ALJ's factual findings, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)).

### B. The Commissioner's Decision

At Step 1, ALJ Friedman found that Scudder met the insured status requirements of the Social Security Act through June 30, 2012, and that she had not engaged in substantial gainful activity since January 27, 2007, the alleged onset date. R 13 (citing 20 CFR 404.1571 and 416.971).

At Step 2, the ALJ found that Scudder had the following severe impairments: osteoporosis of the back, left-sided back sprain and left shoulder disorder. R 13 (citing 20 CFR §§ 404.1520(c) and 416.920(c)). He found that the record showed that Scudder had complaints of neck and lower back pain. Medical imaging of her cervical spine taken on November 9, 2007 showed "mild broad-based disc bulges" at L4-L5 and L5-S1. Scudder also underwent a DEXA scan, which revealed osteoporosis with a high risk of fracture in the lumbar spine and moderate osteopenia, with increased risk of fracture in the left hip. *Id.* (citing Exh. 2F). He also found that the record showed that Scudder complained of left shoulder pain. *Id.* An MRI of her left shoulder taken on April 8, 2008 showed tendinopathy with a small partial surface tear. R 14.

At Step 3, the ALJ did not find that Scudder had an impairment or combination of impairments that meets or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* (citing 20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

At Step 4, the ALJ found that Scudder had the residual functional capacity ("RFC") to perform light work as defined in 404.1567(b) and 416.967(b) except that she was limited to occasional reaching overhead with her left (non-dominant) upper extremity, had reduced feeling in her left hand, and had mild limitations in the range of motion of her left wrist. R 14. He wrote that he had considered all Scudder's symptoms and the extent to which the symptoms could be consistent with the objective evidence and other evidence in the record. The ALJ noted that he was obligated to follow a two-step process: (1) determine whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to cause Scudder's symptoms and, if this is shown, (2) evaluate the intensity, persistence, and

limiting effects of the symptoms to determine the extent to which they limited Scudder's functioning. R 14.

The ALJ wrote that, in making this determination, he considered the following evidence: Scudder's age (50 at the time of the hearing); limited education; low past earnings; alleged disability; the state agency medical consultant's opinion that she could do light work with occasional climbing, stooping, and crouching and had reduced sensation in her left hand; and a treating physician's opinion putting her residual functional capacity below sedentary. R 14. He then found that Scudder's medically determinable impairments could reasonably be expected to cause her alleged symptoms. *Id.* He also found, however, that her statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC noted above. R 14-15. The ALJ noted that he gave "careful consideration" to all the factors described in 20 CFR §§ 404.1529 and 416.929, as well as the SSRs cited, including Scudder's pain medications, their alleged side effects, and her daily activities. R 15.

The ALJ explained that the objective medical findings revealed some limitations, but not to the extent alleged by the claimant. *Id.* For instance, an MRI of her cervical spine showed only desiccation but no cord compression or atrophy. An MRI of her left shoulder showed a small tear but no full thickness tear. *Id.* (citing Exh. 3F). Scudder's description of left side as completely numb or dead was not supported by any evidence in the record. And despite her testimony that she was kept in bed by her osteoporosis and back pain, recent physical therapy notes showed that her back pain was improved. *Id.* (citing Exh. 14F). He also considered the claimant's testimony and the opinions of the state agency physicians. *Id.* He did not give "controlling weight" to the opinion evidence from Scudder's treating physician at Paterson Community Health because it was not supported by objective medical evidence. R 15-16. That opinion stated that her RFC was below sedentary, which was not consistent with objective evidence. *Id.* (citing Exh. 10F, 14F).

Based on all the evidence in the record, the ALJ found that Scudder was not totally disabled. Despite having a "severe" impairment, she retained the capacity to do light work requiring lifting and carrying objects weighing up to twenty pounds; standing and/or walking up to six hours in an eight-hour workday; and sitting up to six hours in an eight-hour workday. *Id.* (citing 20 CFR §§ 404.1567 and 416.967). She was also limited to "occasional" reaching overhead. Overall, he concluded that Scudder was capable of performing past

relevant work as a cashier and fast food cook. R 16. These jobs were classified by the vocational expert as light and unskilled. *Id.*

The ALJ finally concluded that Scudder was not disabled as defined in the Social Security Act. *Id.*

### C. Scudder's Arguments

Scudder's appeal raises five claims of error, which I consider here.

#### 1. ALJ Did not Appropriately Weigh Opinion of Treating Physicians

Scudder's first claim of error is that the ALJ failed to comply with 20 CFR § 404.1527 and *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999), because he failed to afford adequate weight to the opinion of her treating physicians. Pl. Br. at 7. Medical opinions are properly considered together with the rest of the relevant evidence in the record. 20 CFR § 404.1520(b). Opinions from treating sources are generally given more weight, and are given controlling weight if the ALJ finds that a treating source's opinion on the nature and severity of the claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 CFR § 404.1527(c)(2).

Scudder contends that the ALJ ran afoul of these principles by disregarding the opinion of her treating physician and relying on his own impression "gleaned from the record and his own evaluation of [her] credibility." Pl. Br. at 8 (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Kent v. Shywicker*, 710 F.2d 110 (3d Cir. 1983)). Scudder asserts that the ALJ did not indicate how much weight, if any, he assigned to the opinion of a treating physician, Dr. Yung. *Id.*

The ALJ's decision states that he did not give controlling weight to Dr. Yung's assessment because of the other evidence in the record. This finding does not violate the holding of *Morales v. Apfel*, a case cited by the Plaintiff. 225 F.3d 310 (3d Cir. 2000). In *Morales*, the court found that the ALJ's refusal to credit the opinion of the treating physician (a psychiatrist) was not supported by objective medical evidence. *Id.* at 318. Here, however, the objective medical evidence supports ALJ Friedman's assignment of less weight to the opinion of Dr. Yung. Contrary to Dr. Yung's finding of an RFC below sedentary, Scudder's medical records showed that her condition was improving. R 16 (citing Exh.

14

14F, St. Joseph's outpatient records at R 282-287). Those records indicated that as of 2009, Newman scored three-to-four out of four[9] as to her ability to perform activities of independent daily living, including dressing, bathing, and grooming, as well as to her ability to reach overhead, push and pull, and her ability to ambulate. *Id.* The ALJ's discussion of other objective medical evidence in the preceding paragraphs also supported his finding. Scudder's MRIs revealed only a small tear in her shoulder and desiccation of her cervical spine without cord compression or atrophy. R 15 (citing Exh. 3F, at R 212, 235-36).

The ALJ also pointed out that Dr. Yung's assessment was contradicted by the findings of the consultative examiner, Dr. Rubbani, and DDS consultant Dr. Briski. R 15-16. *See also Cotter v. Harris*, 642 F.2d 700, 705 (3d. Cir. 1981) ("when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them"). Dr. Rubbani's exam showed that Scudder was able to walk at a reasonable pace without an assistive device despite having reduced cervical and lumbar spine and hip range of motion and difficulty squatting. *Id.* He also found that Scudder's grip and pinch strength were full although she had mildly limited ranging of her left wrist, and that she had full range of motion with her left shoulder. R 16. Dr. Rubbani's findings were consistent with the DDS RFC of light work, and they are also consistent with the objective evidence in the record.

In sum, the ALJ considered Dr. Yung's assessment in light of substantial other evidence in the record, including objective medical evidence. The ALJ's analysis complied with the requirements of 20 CFR § 404.1527(c)(2). Having found that Dr. Yung's opinion was inconsistent with substantial evidence in the record, ALJ Friedman reasonably determined that it should not be given controlling weight. Under the applicable standard of review, I must defer to that determination.

### 2. ALJ Failed to Properly Evaluate Scudder's Non-Exertional Limitations

Scudder claims that the ALJ failed to employ the correct analysis for assessing her nonexertional limitations. Pl. Br. at 9 (citing *Sykes v. Apfel,* 228 F.3d 259 (3d Cir. 2000)). Scudder argues that Dr. Yung's RFC assessment stated that her pain would frequently be severe enough to interfere with her attention and concentration. Pl. Br. at 9-10. For the reasons discussed above,

---

[9] ALJ Friedman notes that her score was 3 out of 4; it was actually 3-4 out of 4. *See* R 282.

15

the ALJ generally did not credit Dr. Yung's assessment in light of the substantial evidence of record. Further, the Plaintiff does not point to, nor does the record contain, any other evidence indicating that Scudder had any mental nonexertional limitations or restrictions, including limitations related to alleged pain, that would erode her RFC. The ALJ's conclusion that Scudder did not have any nonexertional limitations affecting her RFC was reasonable and supported by substantial evidence, and the *Sykes v. Apfel* analysis for nonexertional limitations is thus inapplicable here. 228 F.3d at 270.

### 3. ALJ Failed to Consider the Side Effects of Claimant's Medications

Scudder asserts that the ALJ failed to consider the side effects of her medication and how they affected her RFC as required by 20 CFR §§ 404.1529 and 416.929(c). Pl. Br. at 10 (citing R 31). This assertion is also not supported by the record.

First, Scudder claims that the ALJ failed to "refer to the fact" that these provisions require that he consider the side effects of medication. To the contrary, the ALJ's decision expressly stated that he considered Scudder's "pain medications, their alleged side effects and her daily activities" when evaluating Scudder's impairments in accordance with Sections 404.1529 and 416.929, and SSRs 96-4p and 96-7p. R 15.

Second, the record does not contain any significant complaints from Scudder related to adverse effects of her medication. There was no mention of adverse side effects during the consultative exam by Dr. Rubbani. R 239-40. Scudder's treatment records also do not attribute any specific limitations to her medication. R 258-61, 273-74. In addition, Scudder completed benefit application forms requiring information about her medication. She listed Fosamax D for osteoporosis and Tramadol for pain, and for the side effects of each she wrote "none." R 143. The only adverse-effects complaint in the record occurred during Scudder's testimony at the hearing before the ALJ. When asked about side effects, Scudder responded that she would sleep through the night and next day if she took "[t]he Ibuprofens and the Percocet's." R 31. There is no other evidence in the record that supports that assertion or suggests that those medications actually caused a functional limitation.

ALJ Friedman did not err in his consideration of the medications' side effects. His conclusions regarding the intensity, persistence, and limiting effects of Scudder's symptoms were supported by substantial evidence.

### 4. ALJ Erred as Matter of Law in Evaluating Scudder's Subjective Complaints

Scudder next claims that the ALJ failed to properly consider her subjective complaints because he failed to consider the factors enumerated in 20 CFR § 404.1527 and SSR 96-7P and made only a "conclusory credibility finding." Pl. Br. at 11-12. Scudder's subjective complaints regarding the severity and limiting effects of her symptoms were found not credible to the extent they were inconsistent with the ALJ's RFC assessment. R 14-15. Scudder asserts that the ALJ's finding of her credibility was not based on substantial evidence because the evidence in the record supported her subjective complaints. Pl. Br. at 13.

When making credibility findings, the ALJ must indicate which evidence he relies on and which he rejects. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir.1999). Pursuant to Section 404.1529(b), allegations of subjective symptoms must be supported by objective medical evidence. SSR 96–7p also makes it clear that the claimant's statements about symptoms are not enough to establish disability, but must be corroborated by medical evidence. SSR 96–7p.

ALJ Friedman's decision complied with these requirements. He explained that Scudder's claims were not wholly credible because the objective medical findings did not reveal limitations of the degree alleged by Scudder. R 15. The ALJ discussed the medical evidence in the record in detail, including the objective findings from MRIs, physical therapy notes, consultative examiner Dr. Rubbani's findings, and opinion evidence from Scudder's physician, Dr. Yung. R 15-16. His decision specifically points out how Scudder's statements regarding her symptoms were not consistent with other evidence in the record—noting, for example, that Scudder testified that she could sometimes not get out of bed because of severe pain, but her physical therapy records indicated that her back pain was improved. R15.[10] ALJ Friedman also pointed out that the MRIs did not show injuries consistent with Scudder's statements about her symptoms. *Id.* (noting that cervical spine MRI did not show any cord compression or atrophy and shoulder MRI showed only a small tear).

The ALJ's conclusion regarding Scudder's subjective statements was based on those statements' inconsistency with the objective medical evidence

---

[10] Scudder also testified that her physical therapist told her that her left side was "dead." R 29. This is also not supported by the records from St. Joseph's, which showed positive progress.

17

and other evidence in the record. It was thus properly supported by substantial evidence. *See Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 618 (3d Cir. 2009) (finding that ALJ properly discounted claimant's testimony by basing finding on the specific medical evidence in the record).

### 5. ALJ Failed to Properly Evaluate Scudder's Residual Functional Capacity

Scudder's last claim of error is that the ALJ erred by failing to consider and explain his reasons for discounting "all the pertinent evidence" in making his determination of Scudder's residual functional capacity. Pl. Br. at 14. Scudder's chief complaint here is that the ALJ did not consider "all the evidence before him" in determining her RFC and, in effect, "picked an RFC out of the sky." Pl. Br. at 15-16. This claim re-treads much of the ground discussed above and is not supported by the evidence in the record.

Scudder argument that the ALJ discounted the "pertinent evidence" necessarily refers to the ALJ's failure to fully credit Scudder's statements regarding her impairment and the opinion of her treating physician, Dr. Yung; Scudder does not point to any other evidence that is not consistent with the ALJ's RFC assessment. The ALJ's reasons for discounting both Scudder's subjective statements and Dr. Yung's assessment were discussed above. And, as discussed above, the other evidence of record discussed in the ALJ's decision—including objective medical findings, consultative exam, and physical therapy records—is consistent with the ALJ's findings.

Contrary to Scudder's assertions, the ALJ did not pick an RFC "out of the sky." The ALJ reviewed and discussed the evidence and heard testimony from Scudder as well as a vocational expert. The ALJ found, pursuant to SSR 00-4p, that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles published by the Department of Labor. R 16. The ALJ then properly relied on the objective medical evidence and the opinions of the state agency consultants to conclude that Scudder had the RFC to perform light work. R 14-16. The ALJ also expressly noted Scudder's limitations: occasional reaching overhead with her left arm, reduced feeling in her left hand, and mild limitations in the range of motion of her left wrist. R 14-16. Both the RFC and Scudder's limitations were consistent with substantial evidence of record.

## III.   CONCLUSION

Plaintiff Scudder's claims of error fail to show that the ALJ erred as a matter of law or that his decision was not supported by substantial evidence. Under the applicable standard of review, that is sufficient to require that I uphold the ALJ's denial of Scudder's claim for SSDI, which is therefore **AFFIRMED**.

An Order will be entered in accordance with this Opinion.

Dated: April 10, 2014

                                                                     **Hon. Kevin McNulty**
                                                                     **United States District Judge**